```
 1   .

 2              IN THE UNITED STATES DISTRICT COURT

 3              FOR THE WESTERN DISTRICT OF OKLAHOMA

 4   .

 5   .

 6   ISABELA SNEED,

 7           Plaintiff,

 8       vs.                    Case No. 22-cv-00031-R

 9   INDEPENDENT SCHOOL DISTRICT

10   NO. 16 OF PAYNE COUNTY,

11           Defendant.

12   .

13   .

14                   DEPOSITION OF

15              GLENN MARC MOORE,

16   taken on behalf of the Plaintiff, pursuant to

17   Notice to Take Deposition, beginning at 1:35 p.m.

18   on the 12th day of July, 2023, at the offices of

19   Appino & Biggs Reporting Service, 800 East 1st

20   Street, Suite 305, in the City of Wichita, County

21   of Sedgwick, and State of Kansas, before Cori R.

22   Power, CCR, CVR, Kansas License No. 1739, Missouri

23   License No. 1436.

24   .

25   .
```

**PLAINTIFF'S EXHIBIT**

**3**

1      A.    My best recollection, yeah, would be that

2  would happen.

3      Q.    I mean, the -- all I have, or at least

4  all that I've been produced so far on this was

5  that he -- that you had asked him to resign

6  effective on the 1st day of June, 2020.

7      A.    No.  I think that was me accepting his

8  resignation.

9      Q.    **Right.**

10     A.    Yeah.

11     Q.    **I -- I haven't seen any kind of**

12  **suspension paperwork.  Was he suspended?**

13     A.    There was -- I don't -- I'd have to look

14  back at the emails, because it seemed like there

15  was some kind of conversation -- or there was only

16  like a few days left on his contract, so there was

17  something along the lines of, hey, I believe, but

18  I don't -- I mean, that's the best I can recall.

19  It would -- it would be in his personnel file.

20     Q.    **Okay.  Let's see if -- let me show you**

21  **Exhibit 6.**

22     A.    Okay.

23     Q.    **Can you see that?**

24     A.    Yes, I see that.

25     Q.    **It says "Doctor Moore, this is my**

1    resignation from employment by Stillwater Public

2    Schools effective June 1, 2020.  I am waiving my

3    right to submit my resignation by certified mail

4    and understand that any remaining salary due me

5    for the 2019-2020 school year will be paid through

6    the district's normal district payroll process

7    because my employment responsibilities ended prior

8    to June 1."

9         A.    Okay.

10        Q.    And this is the documentation that I've,

11   at least, been provided with pertaining to his

12   resignation.

13        A.    Okay.

14        Q.    But I don't see any kind of documentation

15   -- and that's not to say that I couldn't have

16   missed it, but I certainly haven't, in my memory,

17   seen any documentation where he was ever put on

18   suspension.  All I've been produced was

19   documentation showing me that he was allowed to

20   voluntarily resign his position, and he would be

21   paid for the rest of the school year.

22        A.    Well, I know we -- and I'm trying to

23   remember three years ago.  We were -- we were --

24   as soon as I found out from the police, we --

25   since it's essentially a charge, not conviction,

1        A.    Either -- because it was -- there was

2    contact made with -- with Morejon because we -- I

3    remember we were going to come -- have him come in

4    and do -- conduct an interview, but I think that

5    was all done on email as far as communicating with

6    him.  Maybe it was done on a phone or a telephone

7    call, but I don't think so.

8        So we were immediately bringing him in, and

9    there would also be -- I mean, I don't -- that

10   would be shocking if it wasn't a suspension,

11   because there -- because I know there was contact

12   with him, because any time you have that

13   allegation, that would be the process to start

14   investigating it.  We were in the middle of our

15   investigation, and that's when he resigned.

16       Q.    Okay.  So -- and maybe on a break I can

17   look through some other documents and try to help

18   you with that.

19       A.    Okay.

20       Q.    So now tell me about what you remember

21   from the school's investigation after you learned

22   about the -- the allegation by Sneed that -- and

23   her mother was reporting them -- after you learned

24   about those allegations pertaining to Morejon,

25   what did the -- what -- basically your memory,

1    what did the school do next to start to

2    investigate this?

3        A.    Because it was a -- an employee issue,

4    best I can recall, we were going to have -- start

5    our investigation with having him come in, and

6    then before that occurred, and he resigned, or

7    there was maybe a -- I just can't really recall

8    all the information, but I know there was contact,

9    him coming up, let's investigate, not --

10   assumption would be he would not be on campus, and

11   then before we got further into the investigation,

12   he resigned.

13       Q.    And when you say "we," who was conducting

14   the investigation on behalf of the school?

15       A.    I believe Doctor Shanahan and I.  Doctor

16   Shanahan was the director of human resources.

17       Q.    Okay.

18       A.    And I think he helped.

19       Q.    And you -- I mean your contract with the

20   school with the -- with the police department

21   required you guys to report the potential criminal

22   conduct.  Did -- did you -- I'm assuming you

23   didn't have the need to report it because you were

24   told about it by the police; is that fair?

25       A.    Correct, yeah.

1      A.    -- with a crime at the time.

2      Q.    Okay. I thought the resignation happened

3 after the charge.

4      A.    The resignation did happen after the

5 charge; correct.

6      Q.    I'm talking about the -- the weeks -- the

7 last couple weeks of school when you guys asked to

8 have a meeting with him.

9      A.    No, it wasn't the last two weeks of

10 school.

11      Q.    Well, was it the last week of school?

12      A.    It was around that time frame.

13      Q.    Okay. And it was based on someone from

14 the police department calling you guys and telling

15 you what was up; right?

16      A.    Telling me that he was charged or going

17 to be charged, like that -- almost immediately or

18 within the next few -- that day or the next day.

19      Q.    Okay. And then you asked for an

20 interview with him?

21      A.    At that point when it -- when he was

22 charged, then we started conducting our own

23 investigation.

24      Q.    Okay. And how long did that

25 investigation take place?

1      A.   I -- my best recollection is we scheduled

2   a time for him to come in, but it was rescheduled,

3   and by that time he resigned.

4      Q.   Okay.  And so did you not do anything

5   else beyond just setting an interview with him?

6      A.   That was our first step in the

7   investigation.

8      Q.   Okay.  And were there any other steps

9   taken beyond that?

10      A.   Not that I recall.

11      Q.   Okay.  Was it not important for the

12   school to learn about what other faculty members

13   had -- had observed?

14      A.   Our first step was to do an interview

15   with him.

16      Q.   Right.  But after -- after you decided

17   that you didn't need to do the interview because

18   he resigned, was it still not important to find

19   out, hey, what do the other faculty know about

20   this guy and the students?

21      A.   Because the -- now that's -- their --

22   that investigation was to determine whether the

23   employment continued or not, and the employment

24   ended.

25      Q.   Okay.  So it wasn't -- it wasn't an

1    investigation into his sexual misconduct or

2    potential sexual misconduct with students at

3    Stillwater, it was purely into whether or not his

4    employment was going to continue?

5        A.    It was an investigation into his -- his

6    actions, and then if something would have happened

7    there with more information, you could have

8    investigated it further.

9        Q.    I -- I guess what I'm -- I'm trying to

10   understand is if you're going to investigate --

11   investigate him with respect to his actions with

12   students, okay, why you didn't talk to other

13   faculty members about their observations and

14   interactions that they observed with Morejon and

15   the students.

16       A.    We didn't -- the investigation didn't get

17   to that point.

18       Q.    And -- and why is that?

19       A.    I believe because the investigation --

20   when we investigated with him it was because the

21   employment ended.

22       Q.    Okay.  And so you didn't feel like you

23   guys had the responsibility, if there were other

24   victims out there for example, that you would

25   conduct an investigation to find out who

1    addressed at that level and then not shared on up

2    the chain of command.

3          Q.    Okay.  And so -- would -- in that day

4    would it have not have been important for you,

5    when you start this investigation into Morejon, to

6    find out if any other administration or faculty

7    had received reports about it?

8          A.    I have no information about that.

9          Q.    That's not my -- that's not my question

10   though.  Would it not have been important, through

11   an investigation, to find out if other faculty

12   members or other administration had received

13   reports about Morejon and inappropriate conduct

14   with students?

15         A.    His actions prior to that?

16         Q.    Yeah.

17         A.    I'm not -- as far as regarding Morejon,

18   no.  I mean, I -- I'm not sure I understand --

19   understand your question.  Will you restate it?

20         Q.    Sure.  You were going -- it's my

21   understanding that you received word about Mr.

22   Morejon's inappropriate sexual actions with a

23   student through some unknown officer who you can't

24   remember now; correct?

25         A.    I received notification that he was going

1   to be charged.

2       Q.   Okay.  For inappropriate sexual conduct

3   with a student; yes?

4       A.   Correct.

5       Q.   Okay.  And you started an investigation

6   based off that information, a school

7   investigation; correct?

8       A.   Correct.

9       Q.   Okay.  But as part of that investigation,

10  you never asked any of the faculty or any of the

11  other administration if anyone had received prior

12  complaints about Morejon's conduct; is that right?

13      A.   There was a conversation with Ryan Blake,

14  the principal, but there was nothing along the

15  lines that you're talking about that came up in

16  that conversation that I can recall.

17      Q.   Okay.  Well, what came up in that

18  conversation?

19      A.   I -- I don't really recall.  I don't --

20  it was this happened.  He was aware of it, but --

21  but nothing that I recall beyond that.

22      Q.   Okay.  But that -- I mean, Marc, with all

23  due respect, that gives me nothing.  I mean, you

24  say you can't recall it, and that something

25  happened.  I mean, what -- this is my chance to

1   **talk to you while you're under oath.**

2       A.   Right.  I mean, you have to understand.

3   We weren't even -- we were mostly off-campus at

4   that time.  It was probably a phone call; it was

5   during COVID three years ago.

6       **Q.   Well, I know but --**

7       A.   I mean, it wasn't anything significant

8   that I remember other than this happened, you're

9   making sure you contact the principal.  I don't --

10  I don't remember anything of that -- specific in

11  that conversation.

12      **Q.   Okay.  Who is this principal you're**

13  **referring to?**

14      A.   Ryan Blake was the interim principal at

15  the junior high at that time.

16      **Q.   Okay.  And you remember him having some**

17  **phone call with you that involved Morejon; is that**

18  **right?**

19      A.   There -- yeah, there was something in --

20  I knew that the topic was Morejon, but I don't

21  remember the conversation.

22      **Q.   And -- and he felt it important enough to**

23  **reach out to you directly; fair enough?**

24      A.   I don't remember if it was me contacting

25  him or him contacting me.

1      Q.   Okay.  And you dispute that you did that?

2      A.   I -- yeah.  I don't -- I have no

3   knowledge, and I don't have a -- I didn't have

4   personnel files.

5      Q.   I'm not asking about personnel files.

6   He's saying that there were files that were

7   maintained in -- in the superintendent's office

8   that were out of the personnel files, that were

9   maintained separately from a personnel file, that

10  would main -- that would have documentation,

11  historical documentation that had been culled out,

12  not part of the personnel file, about an

13  employee's historical history with -- with the

14  school district.

15     A.   Not that I'm aware of.

16     Q.   He said that one of the secret files had

17  been leaked to the DA's office as it pertained to

18  Principal Fields's exodus from Stillwater Public

19  High School.  You were the superintendent during

20  that time; right?

21     A.   Correct.

22     Q.   Was one of these secret files given to

23  the District Attorney's Office as it pertained to

24  Mr. Fields?

25     A.   I'm -- I'm not aware of any secret files

1      Q.    Okay.   Who started the file?

2      A.    Probably the documents that I had I

3 probably put into a -- a file on my computer.

4      Q.    Okay.   And so you were maintaining that

5 on the school's server or on your computer?

6      A.    No.   My -- everything on the computer was

7 backed up.

8      Q.    Good.   Where did you save the

9 investigation file that you had on Fields?

10      A.    It would be on the school server.

11      Q.    Okay.   Where?

12      A.    On my computer?   I'm sorry.   What --

13 answer the question again.

14      Q.    Where was the investigation file saved?

15      A.    It was saved in the district's archives

16 or district computer, district computer files,

17 because our -- our -- what's happening -- if it's

18 saved on your computer, it's saved on the district

19 files.

20      Q.    But I'm asking you where the system

21 backed it up.   I'll talk to an IT person about

22 that.   I just want to know where you saved the

23 file, what you call the investigative file, in the

24 field?

25      A.    I think it was on my computer.

1       Q.   Okay.  And when did you start maintaining

2  that file?

3       A.   I conducted an investigation.  The files

4  were in that investigation, and that's what I had.

5       Q.   And when did you start maintaining an

6  investigation file is what I'm asking.

7       A.   When -- when I received notification of

8  an incident to be investigated.

9       Q.   Okay.  How did you --

10      A.   Which would have been in November.

11      Q.   How did you receive information about an

12  incident that needed to be investigated?

13      A.   I became aware of an incident at the

14  junior high in early November, and then that's --

15  about a possible incident, and then I investigated

16  it.

17      Q.   Okay.  And was it a possible criminal

18  incident?

19      A.   The invest -- the investigation?  Sorry.

20      Q.   Sir, the -- the incident that you learned

21  about.  Was it potentially criminal in nature?

22      A.   Let me see.  I'm trying to think.  So,

23  like, the first part of the -- there was just an

24  investigation with a student.  I didn't have a

25  suspicion that it was criminal in nature at the

1    beginning of the investigation.

2         Q.   Let's let you walk me through how you --

3    with Mr. Fields, okay, because we're talking about

4    this allegation by a faculty member that

5    explicitly says you kept secret files in your

6    office, okay? Inclusive of secret electronic files

7    on your computer, okay, did you have any other

8    files on your computer that pertained to your

9    faculty members other than the file that you

10   maintained on Mr. Fields?

11        A.   Well, I think, like, we did

12   investigations.  I think like when Mr. Fields

13   began I did an investigation and created for that

14   -- materials from that investigation.

15        Q.   Who taught you to -- whose idea was it?

16   And maybe it was yours, but -- but if not I want

17   to know whose idea was it that you were to create

18   a separate investigation file on your computer as

19   the superintendent when you decided or there was a

20   decision that was made to investigate a faculty

21   member?

22        A.   Who -- who taught me that?

23        Q.   Yeah.  I mean, did you come up with that

24   on your own?  Or did someone tell you, hey, it's

25   a practice here to maintain a file on your

1  him about the employment, and then he -- then he

2  resigned.

3      Q.   I understand that, but you have clearly

4  indicated that you had started an investigation.

5  Multiple times you testified to that.

6      A.   I don't know about "investigation."  It

7  was more to have a conversation about him and his

8  employment.

9      Q.   Okay.  So you want to change your -- you

10  want to change your testimony, that you never

11  started an investigation of Mr. Morejon?

12      A.   Well, I don't -- I don't know if the --

13  "investigation" was the right term.  Maybe it was

14  conversation, but I know we were planning to meet

15  with Mr. Morejon.

16      Q.   Okay.  Is there a possibility that you

17  kept a file about Morejon on your computer, sir?

18      A.   I don't recall a file with Mr. Morejon.

19      Q.   I'm not asking if you recall it.  I'm

20  asking if it's possible that you kept a file on

21  your computer pertaining to Mr. Morejon?

22      A.   I -- I don't know if there is one or not.

23  I don't --

24      Q.   Okay.  You don't know.  There could be,

25  but you don't know?

1          A.    I don't know, huh-uh.

2          Q.    **Right.  And if the suspension letter that**

3   **you referenced earlier in your deposition under**

4   **oath isn't in his personnel file, do you think it**

5   **possibly could be in that investigation file?**

6          A.    If -- if -- to the best of my

7   recollection, and maybe it's just because I've

8   gone through so many, personnel suspension is the

9   first thing, and if I'm remembering correct, if

10  you have a suspension letter, it would be in a

11  personnel file.

12         Q.    Okay.

13         A.    That's why it's confusing to me that --

14  maybe I'm not remembering correctly, but a

15  suspension letter, every suspension letter would

16  have been in a personnel file.  So that's why I'm

17  -- I'm confused.  If -- every case we had -- it

18  was personnel, that's like the first action, so

19  I'm not -- if it looked -- it's confusing that

20  it's not in the personnel file, or I'm not

21  remembering correctly.

22         Q.    Okay.

23         A.    That's what's -- it's a little bit

24  confusing to me.  I mean, three years ago that was

25  just -- I don't know if that's just an assumption

1   that we did it every time, because there's always

2   a suspension letter, but if there's not one in the

3   file, I don't know what -- I don't -- that's what

4   I'm a little confused about right now.  I don't

5   know if I'm just remembering incorrectly.

6       Q.   When you would log on to your computer to

7   access your investigation files that pertain to

8   either students or employees, okay, did anyone

9   else access those files other than you?

10      A.   Not that I'm aware of.

11      Q.   Okay.  So you had sole access to that

12  information; fair?

13      A.   To the best of my knowledge.

14      Q.   Okay.  Walk me through how you would

15  access these electronic files.  You come to your

16  office, you sit down in front of your computer,

17  and what do you do next?

18      A.   I think you just go to file folders and

19  -- and have it organized and go -- go to it.

20      Q.   And what were the folders subtitled?

21      A.   I -- which -- which folder?  I mean,

22  there wasn't a special --

23      Q.   Well, I'd like you to walk me through

24  where you would access this information.  Like did

25  you go -- was there a folder titled "Investigation

1  Files," and then you clicked on that, and when

2  that dropped down, there's a bunch of names or

3  initials?

4      A.  I don't -- I don't know -- remember how I

5  organized them.

6      Q.  Okay.  But you were the one who organized

7  them; right?

8      A.  They were on my computer, yes.

9      Q.  Okay.  And what did you do with those

10  when you left?

11      A.  I'm not sure what they did with my files

12  when I left.

13      Q.  Well, were they aware that you were

14  maintaining these files?

15      A.  I -- not that I'm -- not -- no, I don't

16  know.

17      Q.  Okay.  Did you tell anyone that you were

18  maintaining the files?

19      A.  Not that I can recall.

20      Q.  Okay.  Did you tell the District

21  Attorney's Office that you had maintained a file

22  on Mr. Fields?

23      A.  They requested information, and I gave

24  them the information that I had.  They needed --

25      Q.  Did it include -- you include any

1      A.    If you testify -- if you mandate, you

2    reporting it, if you thought there was sexual

3    abuse or neglect.

4      Q.    **And who would you have to report it to?**

5      A.    We would most often report it to the DHS.

6      Q.    **Well, it's not -- that's who -- look,**

7    **right here.**

8      A.    I can't see --

9      Q.    **Can you read it?**

10     A.    I can't see it.

11           MR. PRIDDY:  Sorry, Dan.  It's so small

12    we can't really see it.

13           MR. SMOLEN:  We'll zoom in on it.  One

14    minute.

15        BY MR. SMOLEN:

16     Q.    **Can you see it better now?**

17     A.    Yes.

18     Q.    **Can you read it now?**

19     A.    Yes.  Most -- most definitely.

20     Q.    **Okay.  I'm going to go down to subsection**

21    **B, okay?  It says "Every person having reason to**

22    **believe that a child under the age of 18 years is**

23    **a victim of abuse or neglect shall report the**

24    **matter immediately to the Department of Human**

25    **Services.  Reports shall be made to the hotline**

1    provided for subsection A of this section. Any

2    allegation of abuse or neglect reported in any

3    manner through a county office shall be

4    immediately referred to the hotline by the

5    department."

6       Section 2, "Every school employee having

7    reason to believe that a student under the age of

8    18 years is a victim of abuse or neglect shall

9    report the matter immediately to the Department of

10   Human Services and local law enforcement. Reports

11   to the department shall be made to the hotline

12   provided for in subsection A of this Section."

13   Did you do that as it pertained to Ms. Sneed?

14      A.   It was communicated -- I think we

15   received it from the law enforcement, so that's

16   why.

17      Q.   Okay.  Do you see where it says you're to

18   report it to DHS and local law enforcement?

19      A.   Yes.  I see that.

20      Q.   Okay.  And you were familiar with that

21   requirement; correct?

22      A.   The reporting of abuse and neglect;

23   right.

24      Q.   Right.  To DHS?  Yes?

25      A.   Correct.

1        Q.    And did you do that as it pertained to

2    Ms. Sneed?

3        A.    I did not.

4        Q.    Did anybody?

5        A.    I'm not aware of others.

6        Q.    For -- did anybody in the school

7    Stillwater school system report it to DHS?

8        A.    I have no knowledge of others, whether

9    they reported it or not.

10       Q.    If it was required, why didn't you report

11   it?

12       A.    I think there was assumptions since the

13   -- where I was working with the law enforcement

14   that that was being -- that was being reported.

15       Q.    Okay.  Well, is there anywhere in the

16   statute that says you can assume it's being

17   reported by other people?

18       A.    I'm not -- no, I don't see anything.

19       Q.    Would you agree with me by not reporting

20   it to DHS you're in violation of the statute, at

21   least as it's written?

22            MR. PRIDDY:  Object to the form.

23       A.    So what was the -- I think there was an

24   assumption that the law enforcement were -- were

25   reporting it.

1       BY MR. SMOLEN:

2       Q.   Okay.  And I know that -- I know that's

3  what you're saying, okay?

4       A.   Yeah.  And that makes me compliant, as it

5  was reported to them.

6       Q.   Well, nowhere in the statute allows you

7  to make an assumption that someone else has

8  reported it; agreed?

9       A.   I don't know all of the -- I don't know

10  all of the statute.

11       Q.   Do you need a minute to read it?

12       A.   Well, no.  It says "report."  My

13  assumption was report it to law enforcement, and

14  that was being reported to DHS.

15       Q.   But you -- you're a doctor; right?

16       A.   Yes.

17       Q.   You have a Ph.D.?  Okay.  Tell me what

18  the difference is between "and" and "or."

19       A.   By reporting it to them, they were also

20  reporting it to DHS.

21       Q.   Who told you they were reporting it to

22  DHS?

23       A.   I think that was my thoughts.

24       Q.   Okay.  So those are just your thoughts.

25  No one told you that; fair?

1      A.   It seemed like we had conversation, but I

2  can't recall all of it.

3      Q.   Okay.  You can't recall anything.

4           MR. PRIDDY:  Object to the form.

5  BY MR. SMOLEN:

6      Q.   I mean, that's my issue.  I'm not trying

7  to get aggressive with you about it --

8      A.   No, it's --

9      Q.   -- but I don't remember anything.

10     A.   We thought that was being reported.

11     Q.   Who is "we"?

12     A.   Or -- or me, sorry.  Me.

13     Q.   Okay.  You felt like you didn't have an

14 obligation to report it to DHS because you assumed

15 somebody else was reporting it to DHS.  That's why

16 you didn't report it.

17     A.   Through law --

18     Q.   Is that your answer?

19     A.   Through law enforcement; correct.

20     Q.   Okay.  But you would agree with me that

21 by you not reporting it, a -- other faculty that

22 were aware of it by not reporting it to DHS,

23 they're in violation of the statute.

24     A.   No.

25          MR. PRIDDY:  Object to the form.

1      A.    No.

2      BY MR. SMOLEN:

3      **Q.    You don't think so?**

4      A.    Correct.  No.

5      **Q.    Why?**

6      A.    Because we're reporting it through law

7      enforcement, and they were communicating through

8      -- through DHS.

9      **Q.    What evidence do you have that law**

10     **enforcement communicated to DHS on Stillwater**

11     **Public Schools's behalf that Sneed had been**

12     **sexually assaulted by her teacher?**

13     A.    I had -- I had no knowledge of Sneed at

14     that time, of that individual.  I just knew that

15     there was an individual, and that was reported to

16     law enforcement.

17     **Q.    So -- so to say that you felt like law**

18     **enforcement was reporting it to DHS, you're**

19     **sitting here telling me that you didn't even know**

20     **who the student was, that you took no steps to**

21     **find out?**

22     A.    They -- that was not shared, that

23     information, when police -- when law enforcement

24     talked to me.

25     **Q.    Did you ask?**

1       A.   Who the student was?

2       Q.   Yeah.

3       A.   I don't recall as having -- I didn't have

4   that information.

5       Q.   What?

6       A.   I didn't have that information.

7       Q.   Did you ask the law enforcement officer

8   who was the student who was assaulted?

9       A.   No.

10      Q.   Did you not care to know?

11      A.   I had -- I had -- I had no knowledge of

12  it, of who that was.

13      Q.   Did you not care to know who the student

14  was, sir?

15      A.   I had a conversation with them about a

16  student.  They said it was a student, one of our

17  students.  We didn't have who it was.  That's the

18  information I had.

19      Q.   And you -- you chose not to ask law

20  enforcement who was the student of your school,

21  that you were responsible for, that was sexually

22  assaulted?

23      A.   I -- I didn't have that information.

24      Q.   But you --

25      A.   Yeah, I didn't have that information.  I

1     A.   Well, there would have just been items

2  that may need to be addressed.  On a school -- if

3  it -- if it happened outside of, then there

4  wouldn't be those issues that you would have to --

5  to address.

6     **Q.   So you're saying if the sexual assault**

7  **occurred off school grounds, then you didn't have**

8  **an obligation to ask about the -- learn about the**

9  **details of it, but if it happened on school**

10  **grounds, you did?**

11     A.   Well, there would just be -- there would

12  be -- yeah, if it -- it was an incident that

13  happened, you know, outside, there wouldn't be

14  things that would be related to school.

15     **Q.   Well, I mean, teachers sexting your**

16  **students might be of interest; right?**

17     A.   Yes.

18     **Q.   Teacher showing up and picking up 15-**

19  **year-olds and going to have oral sex down the**

20  **street might be of interest to you; right?**

21     A.   Yes.

22     **Q.   The -- the number of girls who had been**

23  **subjected to that type of conduct by your faculty**

24  **might be of interest to you, yeah?**

25     A.   Say -- repeat the question.

1      Q.   Finding out the number of victims that it

2  had happened to might be of interest to you, yes?

3      A.   If there were other victims, yes, we

4  would want to know.

5      Q.   Finding out how the teacher was using his

6  position as a faculty member to gain access to a

7  minor child might be of interest to you; right?

8      A.   I had no knowledge if he was using his

9  position.

10      Q.   You understand though, if you're not

11  going to conduct an investigation, then you're not

12  going to find out anything.  That's the whole

13  point.  You understand that you just can't put

14  your head in the sand and say "I don't want to

15  know what happened"; right?

16      A.   People can't put their head in the sand;

17  correct.

18      Q.   Yeah.  You have an obligation, do you

19  not, to create a safe environment for the other

20  students at the school?

21      A.   We have an obligation to create a safe

22  environment for the school.

23      Q.   Right.  And don't you think that ignoring

24  your obligation to find out facts and do any fact-

25  finding puts students at a higher risk?

1      A.   I don't know if there's a connection

2   there.

3      Q.   **Have you ever heard of the term "Turning**

4   **a blind eye"?**

5      A.   Yes.

6      Q.   **What is the difference between refusing**

7   **to do an investigation and turning a blind eye?**

8      A.   We didn't turn a blind eye.  A blind eye

9   is to not -- it goes away completely.  We knew

10   the action with Mr. Morejon ended with his

11   employment.

12      Q.   **And that's all that mattered to you guys?**

13      A.   We were processing the employment issue.

14      Q.   **And then that's all that you were**

15   **concerned about, right, once that was over?**

16      A.   Huh?  What was your question?

17      Q.   **That's all you were concerned about is**

18   **once the employment ended you didn't care about**

19   **anything else?**

20      A.   No.  I don't think that's an accurate

21   statement.

22      Q.   **Okay.  Then what did you do to show that**

23   **you cared about the students?**

24      A.   We didn't have knowledge of the student.

25      Q.   **But then you chose not to go investigate,**

1  sir.  Do you think that that somehow relieves you

2  of your responsibility to create a safe

3  environment?

4      A.   I don't know, sir, how to answer your

5  question there.

6      Q.   So do you think --

7      A.   I'm not sure what your -- I'm not sure

8  what your question was again.

9      Q.   Do you think that by simply refusing to

10  investigate allegations of sexual abuse between

11  your faculty member and a student, that by

12  purposely not gaining information somehow creates

13  a safe environment for your student body?

14      A.   I think we were looking at it from a

15  standpoint of the issue that occurred with Mr.

16  Morejon.  We prevented that issue from happening

17  on the school grounds in the future.

18      Q.   What did you guys do to prevent that from

19  happening on school grounds in the future?

20      A.   He's no longer employed with the

21  district.

22      Q.   Right.  He resigned.  He resigned; right?

23  You guys didn't even fire him.

24      A.   Right.

25      Q.   I'm just trying to understand what you

1    guys did to protect students from people like Mr.

2    Morejon.

3        A.    Okay.  But you're -- if he hadn't

4    resigned, I could project out what the course was

5    going to be of employment.

6        Q.    But he would -- what?  That he was going

7    to be terminated?

8        A.    That is a terminable offense, yes.

9        Q.    I would imagine so.

10       A.    Yes.

11       Q.    I guess where the disconnect is happening

12   is you're saying the school took affirmative steps

13   to make sure that the students were protected in

14   the future from people like Mr. Morejon.

15       A.    Correct, yes.

16       Q.    And can you just give me the list of the

17   things that the school district did to ensure

18   that?

19       A.    He's no longer employed.

20       Q.    Because he personally resigned.

21       A.    He resigned before possible -- facing

22   termination.

23       Q.    Well, did you tell him that he was facing

24   termination?

25       A.    I -- I don't remember what the

1   conversations were when we were going to bring him

2   in, but we didn't bring him in because he didn't

3   -- he -- he resigned before we talked to him.

4       **Q.    Right.  So you guys didn't do anything.**

5       A.    No.  We were scheduled to discipline him.

6       **Q.    And that never happened.**

7       A.    He resigned.  He moved the meeting -- to

8   my best -- he -- he resigned before the meeting

9   occurred.

10      **Q.    So short of accepting Mr. Morejon's**

11   **resignation, can you tell me what the school did**

12   **to protect students like Ms. Sneed?**

13      MR. PRIDDY:  Object to the form.  You can

14   answer.

15      A.    Say -- say -- what -- we were -- say that

16   again.

17      BY MR. SMOLEN:

18      **Q.    Short of allowing Mr. Morejon to resign**

19   **his position and receive his full salary, short of**

20   **doing that, what did the school district do to**

21   **protect students like Ms. Sneed?**

22      A.    I'm not sure regarding Ms. Sneed, but as

23   to regard your question about Mr. Morejon, we were

24   looking -- handling it from a personnel matter.

25   He resigned prior to us handling it as a personnel

1  matter, thus preventing him from negatively

2  impacting students in the future.

3      Q.   I'm not quite making that link, but we've

4  -- we have kind of gone around in circles on it,

5  so I think it's pretty clear, the disconnect.

6      Beyond allowing Mr. Morejon to resign, can

7  you tell me what the school district did to help

8  remedy a sexually hostile environment for people

9  like Ms. Sneed after Mr. Morejon was charged?

10         MR. PRIDDY:  Object to the form.

11     A.   I mean -- so what was -- I'm not sure

12  with reference to her, but Mr. Morejon was no

13  longer employed -- no longer employed, so that

14  prevented any action from him, and then other

15  general policies of things that we have in place

16  to protect kids are involved moving forward.

17     BY MR. SMOLEN:

18     Q.   So you just left the same policies that

19  were there before in place?

20     A.   Policies are continually changing and

21  adjusting.  I'm not being -- that's just the way

22  it is.  They -- they change every month.

23     Q.   I understand, sir.

24     Beyond what you've given me, can you identify

25  anything that the school district did to alleviate