IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

ISABELLA SNEED,                     )
                                    )
          Plaintiff,                )
                                    )
     vs.                            )CASE NO. 22-CV-00031-R
                                    )
(1) INDEPENDENT SCHOOL              )
DISTRICT NO. 16 OF PAYNE            )
COUNTY, OKLAHOMA, A/K/A             )
STILLWATER PUBLIC SCHOOL            )
DISTRICT, A/K/A STILLWATER          )
INDEPENDENT SCHOOL DISTRICT         )
NUMBER 16,                          )
                                    )
          Defendants.               )


DEPOSITION OF SHERAE LEJUNE

TAKEN ON BEHALF OF THE PLAINTIFF

IN STILLWATER, OKLAHOMA

ON MARCH 6, 2023


REPORTED BY DEBRA GARVER, CSR, RPR



PLAINTIFF'S
EXHIBIT
4

1    Q.    All right.  So if we go down now, beginning of

2    this third and fourth paragraph, this is -- this is your

3    summary of what Isabella -- the information Isabella

4    provided during this forensic interview.  Is that right?

5    A.    Yes.

6    Q.    Okay.  And this first part, she's describing

7    sort of the background with this Morejon as her eighth

8    grade teacher, correct?

9    A.    Yes.

10   Q.    And just without reviewing this, do you

11   recall -- do you recall anything as you sit here today as

12   part of the interview when Isabella was talking about her

13   relationship with Mr. Morejon that concerned you?

14        And I'm talking about even before he starts

15   sending the messages, just their relationship as a

16   teacher to a student.

17   A.    I thought it was borderline inappropriate.

18   Q.    Okay.  So one of the first things -- one of the

19   things I wanted to ask you about, it states he, meaning

20   Morejon, let her, meaning Isabella, get away with things

21   that she should not have.

22        And she mentions having her cell phone -- using

23   her cell phone in class, sleeping in class.  He would

24   submit grades for work that she did not turn in, allowed

25   her to sit and sleep behind his desk.

1         Do you recall those?

2     A.   Yes.

3     Q.   And what, if any -- as an investigator who

4   specializes in sort of predatory behavior towards minors,

5   what, if any, concerns would you have about that kind of

6   treatment of Isabella by Morejon?

7     A.   The concern would be he was grooming her.

8     Q.   Okay.  What do you mean by "grooming"?

9     A.   Giving her special attention, trying to gain

10  her trust, grow a sort of relationship between the two

11  that is different than with other students.

12    Q.   Is that type of grooming something that you

13  routinely see in these kinds of investigations?

14    A.   This is the only student teacher investigation

15  that I've worked.  But there are various different types

16  of grooming behaviors.

17    Q.   What about just more generally with

18  investigations that you're involved in with someone

19  sexually preying on a minor?  Do you generally see that

20  kind of grooming behavior?

21    A.   Again, this is the only student teacher one,

22  so, like, the grades and staying -- giving them special

23  attention in class.  The other types of grooming

24  behaviors I see involve maybe parents, stepparents,

25  family members with very young kids, so that would be

```
 1    more grooming of toys, candy, staying up late, things
 2    like that.
 3              So this is a different type of grooming
 4    behavior given the -- where this took place and the age
 5    of the victim.
 6         Q.   But it's the same -- it's essentially the same
 7    concept, correct?
 8         A.   Correct.
 9         Q.   And it's special attention for the purpose of
10    what?
11         A.   Gaining trust, building a relationship.
12         Q.   Okay.  She also indicated -- Isabella -- that
13    she was the only one in the class that was allowed to do
14    those things.  Do you recall that?
15         A.   I don't, but if it's in here, I could find it.
16         Q.   It's like a couple lines down there.  It says
17    Isabella said she was the only one in the class he
18    allowed to do those things.
19         A.   Okay.  There were other people in the room
20    sometimes, but most of the time it was just Alberto.
21         Q.   And, again, is that consistent with
22    grooming-type behavior?
23              MR. PRIDDY:  Object to the form.
24         Q.   (By Mr. Blakemore)  Answer if you can.
25         A.   Oh, I'm sorry.  Could you repeat the question?
```

1    Q.   Basically, what she's saying is that Morejon is

2  singling her out for this kind of special treatment in

3  the class, right?

4    A.   Correct.

5    Q.   And my question was:  Is that consistent with

6  what you're trained to be grooming-type behavior?

7    A.   It's consistent.

8    Q.   All right.  Down here a few more lines, it says

9  Isabella says he, meaning Alberto, would tell her not to

10  worry about turning anything in if she was having a bad

11  day and he would input the grade.

12    A.   Correct?

13    Q.   You see that?

14    A.   Yes.

15    Q.   Again, consistent with a grooming, correct?

16    A.   Special attention, yes.

17    Q.   All right.  A few more sentences down here, it

18  indicates that Isabella said other teachers notice

19  Alberto's behavior as well.  Do you see that?

20    A.   Yes.

21    Q.   And did you -- well, first of all, do you

22  recall -- do you recall Isabella saying that?

23    A.   It's -- if it's in the forensic interview, I

24  mean, yes.  Reading it here in the report right now, I

25  recall that.

1    then her mom coming to the police, right?

2        A.   Yes.

3        Q.   All right.  In the next paragraph, Isabella and

4    her mother discuss reporting to the police because there

5    could be other girls he's talking to as well.

6             Did I read that correctly?

7        A.   Yes.

8        Q.   And, ultimately, you did find that there were

9    other -- at least one other victim?

10       A.   Yes.

11       Q.   Okay.  And so we're now getting into, this next

12   paragraph, kind of how you conducted this investigation

13   specific to Isabella and Morejon.

14            Could you explain to the jury how you conducted

15   this part of the investigation?

16       A.   I spoke with them about taking over the account

17   to chat with Morejon.

18       Q.   And when you say "taking over the account,"

19   what do you mean?

20       A.   From whatever point we decided to start, I

21   would be the one that would be in control of what

22   messages or images or videos -- any digital data that was

23   sent.  No one else would have any input in it.

24       Q.   Okay.  And is that how, ultimately, this

25   investigation was conducted?

1      A.    Yes.

2      Q.    And had you done investigations similar to this

3   before?

4      A.    Yes.

5      Q.    And were you trained in how to conduct this

6   kind of investigation where you essentially take control

7   of someone's social media account or text messages?

8      A.    Yes.

9      Q.    And did you rely on that training and

10  experience in conducting this investigation into

11  Mr. Morejon?

12     A.    Yes.

13     Q.    All right.  I just want you to -- mostly, I

14  just want you to identify these for the record.

15           There were actually two days that you -- you

16  did this aspect of the -- this part of the investigation,

17  right?

18     A.    Yes.

19     Q.    And the first day, I believe, was the 15th,

20  correct, May 15th?

21     A.    Yes.

22     Q.    And then the second day was May 19th; is that

23  right?

24     A.    That would be correct.

25     Q.    Okay.

```
 1              MR. PRIDDY:  Bob, just for the record, we're

 2   talking about 2020, correct?

 3              MR. BLAKEMORE:  Yes.

 4              MR. PRIDDY:  Okay.

 5        (Exhibit 2 identified.)

 6        Q.  (By Mr. Blakemore)  All right.  I'm marking this

 7   as Exhibit 2.

 8              Can you identify what I've marked as Exhibit 2

 9   for the record?

10        A.   This is a screen shot of Isabella's phone in a

11   conversation with a person identified as Alberto Morejon

12   within the app.

13        Q.   Okay.  And these were -- these images were part

14   of your investigative file, correct?

15        A.   Yes.

16        Q.   All right.  So if you look at -- I'm going to

17   kind of look first at what you have in the report.  And

18   you indicate -- and these are the -- this is the part of

19   the investigation.

20              On May 15th, 2020, you say that at the time you

21   begin documenting Alberto's responses with the digital

22   camera, however, you failed to document the messages sent

23   to him.  Do you recall that?

24        A.   Did I write that in here?

25              Is that what you're asking me?
```

1    Q.   Yeah, you did write it.  Do you recall that

2  though?

3    A.   Oh, yes.  Yes.  Yeah.

4    Q.   Was that just an error, that you didn't

5  document the messages sent to him, or was there a

6  particular reason that you did that?

7    A.   That was my error.

8    Q.   Okay.

9    A.   It unfolded quickly, and if I had -- I should

10 have been taking screen shots of every single thing that

11 was sent and received and it slipped my mind or that was

12 my error.

13   Q.   Okay.  So these, I believe, are the ones on the

14 15th, and that's Exhibit 2.

15        And these are just -- these just represent

16 responses from Morejon's phone, right?

17   A.   Yes.

18   Q.   All right.  So there's one here.  So he -- so

19 that looks like it's 6/31, and that's page 18.

20        I'm on Exhibit 2, the pictures.

21   A.   Okay.

22   Q.   And it says -- well, at the top it says, Also

23 your mom has a house in Stillwater and Guthrie.

24        Do you know what that was in reference to?

25   A.   I believe her mother was dating somebody in

1    Guthrie at that time.  And her mom was in Guthrie, or

2    that's at least what we were saying.

3        Q.   And then he says -- if you look down here, it

4    says, You're a virgin though, you ain't even ready.

5             Did I read that correctly?

6        A.   Yes.

7        Q.   And do you know what -- do you recall what that

8    was in response to?

9        A.   I don't.

10       Q.   But can we agree that whatever it was in

11   response to, that's not an appropriate thing for a

12   teacher to be texting to a minor student?

13       A.   Yes.

14       Q.   All right.  If you look down -- I'm now back at

15   Exhibit 1, on your report, and I'm on page 8.

16            So there's a section there where you're kind of

17   quoting some of his messages from May 15th.  And then if

18   you go down after that, in sort of the middle of the

19   page, it starts out, It was obvious.

20            Do you see that?

21       A.   Yes.

22       Q.   So you state, It was obvious that Alberto was

23   not going to meet.

24            And do you recall what that was in reference

25   to?

1      A.   At that time we were intending on seeing if he

2  would meet -- I mean, obviously, we're talking about some

3  sexual behaviors that hasn't been -- and sex act that has

4  been identified.

5          But we were going to see if we could obtain

6  that to make it a criminal investigation and have him

7  meet this student in person, underage student.  It was

8  clear he was staying in for the night, he wouldn't be

9  able to leave.

10         So if we kept pushing that, I think it would

11  have ruined this case, ruined that investigation.  And I

12  think it would have bolstered it if we could pick up a

13  few days later and say, look, he's still continuing this

14  type of behavior.

15     Q.   Did you ever get the impression that he was

16  beginning -- he was beginning to get a little suspicious

17  about some of the messages or?

18     A.   No.

19     Q.   Okay.  But there was -- Isabella did say during

20  her interview that he would make sure that she erased all

21  the messages on her phone.

22         I mean, he was taking measures prior to this to

23  hide or cover up the behavior.  Would you agree with

24  that?

25     A.   Yes.

1    Q.   Okay.  So you say, this next sentence, To

2  protect the integrity of the case, I decided to end the

3  conversation with Alberto.

4           Is that sort of what you just testified to?

5    A.   Yes.

6    Q.   All right.  So next paragraph, then, we're at

7  May 19th.  And this is sort of the second round of the

8  same type of investigation with the direct messaging,

9  right?

10    A.   Yes.

11    Q.   But this time you took screen shots of both

12  ends of the messages; that is, from Isabella's phone and

13  the responses from Morejon, correct?

14    A.   Correct.

15    Q.   Okay.  I'm going to mark this as Exhibit 3.

16    (Exhibit 3 identified.)

17    Q.   (By Mr. Blakemore)  And this is a pretty lengthy

18  document, but if you'd just take a second to look through

19  that.

20    A.   I remember -- I don't remember all these, but,

21  yes, I remember this conversation.

22    Q.   Okay.  And are these -- and I'm talking about

23  Exhibit 3 that I've handed to you.

24           Are these screen shots that you took?

25    A.   Yes.  So I had a digital camera on a mount, and

1   I'd just slide the phone under and take the photo,

2   because these messages disappear.

3      Q.   All right.  So you indicate:  It should be

4   noted that none of the images of Isabella were

5   provocative or suggestive in nature.

6          Why did you think it was important to note

7   that?

8      A.   I don't want a jury or anyone else to look like

9   we were entrapping Morejon.  In fact, at one point she

10   was wearing a police jacket.  It was cold in there.

11      Q.   They only show -- "they," meaning the images,

12   only showed enough of her face or upper body for Alberto

13   to identify her.

14          And that's important so he's -- obviously, that

15   he knows it's her and he's not going to be suspicious,

16   right?

17      A.   Right.  And it maintains how they normally

18   spoke by showing those same types of photos to each other

19   when they had conversations.

20      Q.   Okay.  All right.  If you'd turn to page 10 of

21   your report.  Can you just generally describe what this

22   is, what we're looking at on page 10?

23      A.   This is just the conversations that take place

24   on these screen shots.  It's just transcribed into my

25   report in order.

1      Q.    And you might take a second to read through

2   this, but my question is:  At what point -- and it goes

3   on to page 11.

4            But at what point during this process did you

5   believe that you had probable cause that a crime had been

6   committed?

7      A.    Can I read through?

8      Q.    Sure.

9            (Brief pause.)

10           THE WITNESS:  So his intention with meeting

11   her, it's clear, you know, the risk; so suck his dick,

12   that's an identified sex act that would be happening if

13   they were to meet in person.

14      Q.    (By Mr. Blakemore)  Okay.  And if you would,

15   just kind of read the rest of this.  It goes on,

16   actually, to the middle of page 12.  And just kind of let

17   me know each time you see something that you think is

18   criminal.

19      A.    Oh, so start on page 10 and go through?

20      Q.    Yeah, yeah, if you would.

21           That's the first one that you saw?

22      A.    So this entire conversation would be -- just to

23   kind of wrap it up, you have to have an identified sex

24   act, that you are going to meet, and you have a place and

25   a time.

1    So he's talking about the risk to suck his

2    dick.  She's talking about, I would feel comfortable with

3    you and give me some tips since you don't want to meet.

4         And he says, Why?  Are you about to suck

5    someone's dick and you want to practice first?

6    Q.    And how old is -- how old was Isabella at this

7    time?

8    A.    Fourteen.  That's from Gee's report.

9    Q.    Okay.  I want to ask you just for a second

10   specifically about one thing here.  It's on page 10

11   towards the bottom.

12        He says, "I dare you to ask Avery Blakey for

13   advice and see what she says."

14        Did you have any appreciation for what that

15   meant?

16   A.    It sounds like he has done something with or to

17   Avery Blakey.

18   Q.    Do you know who Avery Blakey is?

19   A.    Yes.

20   Q.    Did you follow up on that information?

21   A.    No.

22   Q.    Okay.  How is it that you knew who Avery Blakey

23   is?

24   A.    I have -- she's part of some other

25   investigations having nothing to do with this.

1    Q.    Oh, okay.  Is there a reason why you didn't

2 follow up on that statement?

3    A.    Unavailability on the victim's part.

4    Q.    Okay.  When you saw that statement, did you,

5 though, have a concern that there were potentially other

6 victims?

7    A.    Yes.

8    Q.    Okay.  So I'm looking now at page 11, but

9 there's some other lewd language here that he's using in

10 connection with oral sex.  And is that, again, additional

11 evidence of a crime?

12    A.    Yes.  He's using an electronic device to talk

13 about sex acts, yes, with a minor.

14    Q.    All right.  Towards the bottom of page 11, it's

15 the 6:22 p.m., and you're describing the photo, or the

16 screen shot view, of the lower portion of the same person

17 wearing the same clothes but with the front shorts pulled

18 down.  He's holding his groin area over his underwear

19 outside of his shorts with his left hand.

20         And then it says, "Those aren't my shorts."

21 Did I read that correctly?

22    A.    Yes.

23    Q.    And is this one of the -- if you recall -- I'll

24 find it here.

25         Do you recall there being what we've talked

```
 1   about before as being an imprint image?

 2        A.   Yes.

 3        Q.   All right.  So I think if you turn to -- and

 4   now I'm back at Exhibit 3.  If you'd turn to page 65.

 5        A.   Mm-hmm.

 6        Q.   Is that the image that you're describing in the

 7   report at 6:22 p.m.?

 8        A.   Yes.

 9        Q.   And would you describe this as a imprint image?

10        A.   No.

11        Q.   Okay.  How would you describe this?

12        A.   An imprint image would be like an erect penis

13   under tight-fitting clothing.  This is him grabbing

14   himself.

15        Q.   Okay.  Is this legal behavior?

16        A.   No.

17        Q.   Okay.  So page 65 of Exhibit 3, that would be

18   additional evidence of a crime?

19        A.   Yes.

20        Q.   By the way, we've been going for, like, an

21   hour.  If you want to take a break --

22        A.   No, I'm good.

23        Q.   Okay.  Next page, page 12 of your report, and

24   the first, like, full paragraph past the quotations from

25   the screen shots, you indicate that you requested
```

1    A.   I can't -- without reading further, I can't

2 remember if it was a deleted account or if he had just

3 deleted those messages.

4    Q.   Okay.  If, in fact, he deleted those messages,

5 could that have been obstruction, potentially?

6    A.   I've never thought of it that way.  I mean, if

7 you wanted to stack charges, we could see if it meets the

8 elements.

9    Q.   Okay.  I was just curious.

10    All right.  Next paragraph, this is where

11 you're describing -- it's May 22nd, 2020, and you

12 received a call from Alberto's step-father-in-law.

13    And that's Mr. Jared Brisbin, correct?

14    A.   Yes.

15    Q.   And did Brisbin -- had you attempted to contact

16 him or did he make first contact with you?

17    A.   I think he called me first.

18    Q.   And it indicates here that -- and, again, this

19 is a recorded call that's part of your investigative

20 file, correct?

21    A.   Yes.

22    Q.   Indicates that Brisbin said Alberto admitted to

23 him that he, quote, did it and told him that there were

24 other girls, but he does not think that they are known.

25    Did I read that correctly?

1    A.    Yes.

2    Q.    So we've got, you know, his statement about

3   Avery Blakey and now we've got the step-father-in-law

4   telling you that there are other girls.

5         So at this point what, if anything, are you

6   doing to follow up with respect to the other potential

7   victims?

8    A.    So with Avery Blakey, it's reaching out to

9   parents saying, hey, we have this information.  Whenever

10  we receive information from the other victim, I follow up

11  with that victim that you -- you can't just send out an

12  email to the schools saying, hey, this happened, talk to

13  your kids.

14        It's a very sensitive and vulnerable time for

15  victims to come forward, and when they're ready, they

16  will.

17   Q.    And Blakey, I think what you're telling me is

18  that her parents said they didn't want --

19   A.    I'm not going to talk about it.

20   Q.    You can't talk about that.

21        But it didn't go anywhere?

22   A.    No.

23   Q.    Yeah.  Okay.  You also state in here Alberto

24  said he did act on one of the girls?

25   A.    Yes.

1    picture messaging.  I only took screen shots of the text

2    conversations that could be read.

3              Did I read that correctly?

4    A.    Yes.

5    Q.    Where are those -- where are those screen

6    shots?

7    A.    I would assume they were submitted into

8    property.

9    Q.    Okay.

10   A.    If they were not made available, that was for

11   not any immoral reason.

12   Q.    Okay.  The last -- well, second to the last

13   paragraph, you indicate Alberto's phone was disconnected

14   from cellular and internet services upon its seizure and

15   you later placed the phone in a Faraday bag.

16             Is that -- is that still in evidence?

17   A.    Yes.

18   Q.    Okay.  So after this arrest takes place, aside

19   from this Mr. Brisbin, were you contacted by anyone else

20   with respect to Morejon?

21   A.    No.

22   Q.    All right.  So there was, though, a -- there

23   was, though, a second investigation, correct?

24   A.    Yes.  Now, that case I don't want talk about.

25   That's -- she can still come forward.  I don't want

1  something to be -- to mess -- interfere with that

2  investigation at a later date, if that makes sense.  And

3  she's still in communication with us.

4       Q.   Oh, has there not been --

5       A.   So, yeah, the statute of limitations is 40

6  years after the time that they disclose.

7       Q.   Okay.

8       A.   So she has been on the fence, which is totally

9  understandable, and it can take a lot of time for her to

10  talk.  And that is a good case.  I just want to respect

11  her -- her rights to wait.

12       Q.   Okay.

13       A.   And she's -- if you have that information, then

14  you have her --

15       Q.   So, no charges have been filed yet?

16       A.   No.

17       Q.   And I'm not going to even -- I won't even use

18  her name.

19       A.   Okay.

20       Q.   I just want to ask you a couple general

21  questions.

22       A.   Okay.

23       Q.   There was a second victim?

24       A.   Yes.

25       Q.   And how did you learn about that?

1      A.    I don't remember.

2      Q.    Okay.  The second victim was also a student of

3  Mr. Morejon at Stillwater Middle School, correct?

4      A.    Correct.

5      Q.    And were there similarities in what was

6  reported by the second victim and what you saw with

7  respect to Isabella?

8      A.    Yes.

9      Q.    And just as you sit here, what are some of

10  the -- what are some of the similarities?

11          Again, without using her name or -- but what

12  were some of the similar conduct between the two cases?

13      A.    Meeting -- he talked about, with Isabella,

14  meeting at a neighbor's house that he was housesitting

15  for.  And this other victim talked about that same thing,

16  that they had a place that they could go to for things to

17  happen.  And just singling out within the schools, within

18  class, extra attention to her.

19      Q.    The grooming type --

20      A.    Yes.

21      Q.    -- behavior?

22      A.    Just gaining that trust.  And she was -- she

23  was a vulnerable kid.

24      Q.    And the second victim -- does the fact that

25  there are the similarities between the two cases and what

1  the second victim's reporting, does that, in your mind as

2  an investigator, make it more credible?

3      A.   Yes.

4      Q.   Okay.  And, overall, do you find what the

5  second victim has told you about Mr. Morejon's behavior

6  to be credible?

7      A.   Yes.

8      Q.   But as it stands right now no charges have been

9  filed, and you attribute that to, again, the victim,

10  understandably, being concerned about going forward to

11  that extent.  Is that right?

12     A.   Correct.  And Mr. Morejon is aware of the

13  second victim and the charges that can be brought forth,

14  and that there's many, many years that this could take

15  place.  He is aware of that.

16     Q.   Of course.

17     A.   It's just whenever she's ready, if she's ever

18  ready.

19     Q.   Okay.  Has anybody else -- since this happened,

20  aside from this second victim, Brisbin, has anybody come

21  to you and asked -- or reported to you about any

22  additional inappropriate conduct by Morejon?

23     A.   No.

24     Q.   Has anyone from Stillwater Public Schools

25  contacted you about the investigation at any time?