```
          IN THE UNITED STATES DISTRICT COURT
       FOR THE WESTERN DISTRICT OF OKLAHOMA
```

ISABELA SNEED,       )
      Plaintiff,     )
                     )
vs.                  ) Case No.  22-cv-00031-R
                     )
INDEPENDENT SCHOOL   )
DISTRICT NO. 16 OF   )
PAYNE COUNTY,        )
      Defendant.     )


DEPOSITION OF
VICTOR GONZALEZ


DATE:  MARCH 1, 2023

REPORTER:  MARISA SPALDING, CSR, RPR


Spalding Reporting Service, Inc.
1611 South Utica Avenue, Box 153
Tulsa, Oklahoma 74104
spaldingreportingservice@cox.net
(918) 284-2017



PLAINTIFF'S EXHIBIT 6

```
 1  but...
 2       Q    Okay.  So I had heard that about his
 3  claim that he had led the --
 4       A    Yeah.
 5       Q    -- walkout.  I haven't really looked
 6  much into it.
 7       A    He did a bunch of stuff on Face --
 8  all he did was talk a lot on Facebook.
 9       Q    Okay.  Big talker?
10       A    Big talker, nothing doer.
11       Q    Okay.
12       A    No money where your mouth is.
13       Q    I understand.  I understand what
14  you're saying.  You guys weren't friends,
15  correct?
16       A    No.
17       Q    Okay.  I want you -- and I know
18  you've not been there and it's been some
19  time since this happened, okay?  But I
20  really want you to try to go back, use your
21  memory to think about interactions that you
22  observed with him.
23       There's -- there's a lot of reports from
24  the police reports that he would -- it
25  would be very common for him to have female
```

students in his classroom during break
times and then after school.  Do you recall
ever seeing that?

   A   The after school, I don't remember.
But during break times, yes, and at lunch.

   Q   Tell me what you remember from break
times and at lunch, just based off your own
observations, what you remember seeing?

   A   All I remember is a lot of girls
going to his -- even 9th grade girls coming
back to the 8th grade hallway to go to his
room during breaks, so then they'd be late
to their 9th grade class.

   Q   Okay.

   A   And then I remember there was --
God, I can't remember his name.  I think
he's Irish.  He's -- Fieldsend.

   Q   British?

   A   British.  Well --

   Q   It came up this morning.  That's the
only reason I know he's British.

   A   Fieldsend, yes.  He'd always have
the, well, well, Morejon has got his harem
going on over there.  I don't know what the
heck is going on over there.

1   Q   Okay.  So I'm glad you brought that
2   up, because that was something I wanted to
3   ask you about, but I didn't want to load
4   you up with too many documents just yet.
5   But since you brought it up, it's kind of a
6   perfect timing to cover it.  So take a look
7   -- and this -- it's weird.
8       But the third page is kind of where it
9   starts.  It's an email string.  It's
10  Exhibit 15.  I'll get you an extra copy.
11  And then the middle page, it looks just to
12  be like some Internet script, but then the
13  first page is the response.  And I'll show
14  you as we walk through it.  On the last
15  page, there's a post from Morejon and he
16  says -- I'm right here on this third page?
17      A   Okay.
18      Q   He says:  During FTC -- or excuse
19  me.  During PTC, whenever I was being a
20  dedicated baseball coach and working for $2
21  an hour, someone came into my room and,
22  quote, looked (sic) slash stole my Hawaiian
23  license plate.  I honestly forgot about
24  this, but the kids have put me into
25  depression today and I randomly remembered

the one thing that makes me smile during the day, the rainbow on the license plate.

If anyone has seen this license plate, please return. I'm really missing it. And if you look on the first page, our friend from across the pond says -- Trevor -- sorry.

A    Trevor Fieldsend.

Q    Fieldsend, yeah.

A    Maybe one of your 9th grade female incurred -- entourage took it for a souvenir.

Q    Right. It says: Maybe one of your 9th grade female entourage took it for a souvenir?

A    That is -- yeah, that's Fieldsend.

Q    This seems to be kind of consistent with what you had testified to about your 9th grade female harem, right?

A    Uh-huh, they just keep coming. It was weird. It was odd.

Q    Yeah, so as a person who is in education, right, and you're observing this, it sounds like it was a situation that was outside of the norm; that it was

```
 1  odd, just based on your view of the
 2  situation; is that fair?
 3      A    Yes.
 4      Q    Okay.  Do you know Fieldsend very
 5  well?
 6      A    Just from --
 7      Q    Coworkers?
 8      A    Coworkers and we'd -- sometimes we
 9  had lunch together, I mean --
10      Q    Okay.  But --
11      A    -- because we sat in the same room,
12  so you always have that -- I mean, you
13  can't laugh.  But, you know, British humor,
14  come on.
15      Q    I -- I appreciate it as well.  But
16  you guys weren't like buddies outside of
17  school?
18      A    No.
19      Q    Okay.  Other than Fieldsend saying
20  to you, look at Morejon with his harem of
21  girls, what else -- do you have any other
22  specific recollections of him talking to
23  you about any concerns beyond that?
24           MR. PRIDDY:  Object to the form.
25           THE WITNESS:  The only thing I
```

would say was I think I recall once, that's probably not a good idea and it's probably going to get him in trouble at some point.

Q (By Mr. Smolen) By having all the young girls in his classroom?

A Yes.

Q Okay. During the breaks and during the lunchtime?

A Yeah.

Q Okay. Do you know or do you recall what Trevor did at the school, like what his position was?

A He was -- at one point, he was shop teacher, but then he -- because they kind of eliminated that type of stuff. He was the engineering...

Q Someone said that --

A At one point, he was like right across from the hall from --

Q From Morejon?

A -- Morejon.

Q Okay. So he would have been --

A So this side all -- it's not, I mean, him and the -- the typing or computer teacher would also see that all the time.

1  A   Right.
2  Q   Okay. There's been testimony prior
3  to your deposition that it wouldn't be
4  uncommon for kids to go spend time with a
5  faculty member during the lunch hour maybe
6  to catch up on some schoolwork or to get
7  some extra assistance. But that generally,
8  that -- that process was tracked through an
9  administrator who was in the cafeteria who
10 would allow the student to go?
11 A   To go, yes.
12 Q   Is that also consistent with your
13 memory?
14 A   Yes.
15 Q   Okay. Is it fair to say that if
16 Morejon had a lot of girls in his classroom
17 during the lunch hour, that somebody would
18 have been aware of it through the practice
19 at the school in receiving permission to go
20 from the cafeteria or the eating lunch area
21 to his room?
22 A   I would think so, yes.
23 Q   Okay. And did you ever have the
24 responsibility of monitoring the cafeteria
25 or lunch room?

1  A    I monitored the front, but I didn't
2  do the hallway, so I -- all I did was try
3  and keep the chaos calm.  Because whenever
4  I was there, we -- at -- we had every -- we
5  had just -- what was it?  Two lun -- two
6  lunch -- no, three lunch periods, but we
7  had split -- I know they had split it up
8  before I left.  We had two -- the three
9  lunch periods, but we had an A part and a B
10 part, which cut down on the number of
11 people that you had in there, because
12 before it was --
13      Q    Crazy?
14      A    -- jam packed.  I mean, it was hard
15 to keep track of.
16      Q    Okay.  There was some testimony
17 yesterday from Mr. Fields, the former
18 principal --
19      A    Uh-huh.
20      Q    -- that he thought that generally
21 there'd be an administrative level employee
22 who was kind of granting students the
23 ability to leave and go to the -- down the
24 hall to the classrooms.  Is that consistent
25 with your memory?

SPALDING REPORTING SERVICE
918-284-2017

```
 1    A    The cell phone policy was -- well,
 2  phones they're supposed to be off whenever
 3  the teacher is talking is --
 4    Q    Okay.
 5    A    -- what they're doing.
 6    Q    Okay.  Do you remember if there was
 7  any kind of written policy or even an
 8  unwritten practice as it pertained to -- or
 9  an expectation, so to speak, as it
10  pertained to students having communications
11  with faculty, their teachers, over social
12  media?
13    A    For the most part, I know out of
14  practice, it shouldn't happen.
15    Q    I would have thought that --
16    A    I mean, you can see that in your --
17  in -- in classes that you take, that it's a
18  fine line.  You should not interact.
19    Q    It's a bad idea, right?
20    A    (Moving head up and down)
21    Q    I'm just curious if you ever
22  remember anyone at Stillwater Public
23  Schools saying, hey faculty, you can't talk
24  to students over social media?
25    A    Not directly.
```

SPALDING REPORTING SERVICE
918-284-2017


```
 1    A    The cell phone policy was -- well,
 2  phones they're supposed to be off whenever
 3  the teacher is talking is --
 4    Q    Okay.
 5    A    -- what they're doing.
 6    Q    Okay.  Do you remember if there was
 7  any kind of written policy or even an
 8  unwritten practice as it pertained to -- or
 9  an expectation, so to speak, as it
10  pertained to students having communications
11  with faculty, their teachers, over social
12  media?
13    A    For the most part, I know out of
14  practice, it shouldn't happen.
15    Q    I would have thought that --
16    A    I mean, you can see that in your --
17  in -- in classes that you take, that it's a
18  fine line.  You should not interact.
19    Q    It's a bad idea, right?
20    A    (Moving head up and down)
21    Q    I'm just curious if you ever
22  remember anyone at Stillwater Public
23  Schools saying, hey faculty, you can't talk
24  to students over social media?
25    A    Not directly.
```

Q   Okay. Do you ever remember anyone at Stillwater Public Schools telling you, hey guys, if a student contacts you over social media, here's what you're to do?

A   No.

Q   Yesterday I took the deposition of the former principal, who I understand had been asked to resign his employment. Do you -- you were there at that time, correct?

A   Uh-huh.

MR. PRIDDY:   Object to the form.

Q   (By Mr. Smolen) What do you recall or what do you -- even if it's not direct knowledge, okay, I want a general understanding of what your knowledge is about why he was asked to resign or what brought about the end of his employment with the school district?

MR. PRIDDY:   Object to the form.

THE WITNESS:   Do you want the incident?

Q   (By Mr. Smolen) I want everything you know about it. And -- and if you -- if you had direct knowledge of it, I'd like to

        Q    And do you recall if it was the HR Director that told you, look, those are our files; we're not okay with that?
        A    No, it was the assistant superintendent.
        Q    Okay. And who was that at the time?
        A    Cathy Walker.
        Q    And was she the assistant superintendent the entire time that --
        A    Yes.
        Q    -- you recall these negotiations happening over those three years?
        A    Yes, those three times I brought it up, yes.
        Q    Okay. And when do you think -- if you could give me your best estimate on timing wise, okay, what years do you think that it was that you were bringing that up?
        A    Probably from about 2018/2019 up to -- because last year I didn't do negotiations. So it would be the year before that, 2021.
        Q    Okay. So 2018, 2019 through 2021?
        A    Yes.
        Q    Gotcha. Now, how did you come to

know about the secret files that were maintained that were not part of the actual employee's personnel file? How did you come to learn about those?

    MR. PRIDDY: Object to the form.

    THE WITNESS: More than anything, I mean, it just -- by word of mouth and what I found out from other people as far as involvement like Fields' case and stuff like that.

Q   (By Mr. Smolen) Okay. Tell me about -- did you have a concern that there might be information out there about faculty members that only certain people knew that was not being actually put into their personnel files as well?

A   Yes.

Q   Okay. I understand that you were wanting, look, after seven years --

A   I was looking at -- yeah, I was wanting there to be a fair start and a fair way of looking at things.

Q   Transparency?

A   Right.

Q   With a limitation on, hey, maybe

1  tried to -- at one point, they gave me the
2  reasoning that they needed to keep these
3  files because it was just something that
4  they kept and it was always done.  And then
5  they gave me the example that those things
6  are done on a corporate level and all this
7  other -- so basically trying to justify why
8  they needed to keep them.
9      Q   Okay.
10     A   And then, of course, they said
11 that's -- we're not going to go there.
12     Q   Okay.  I'm taking by -- we don't
13 have a camera here on you.  But I'm taking
14 by your body language and your facial
15 responses that you -- you weren't real
16 thrilled about that decision?
17     A   No, I was not.
18     Q   Okay.  When we talk about it at the
19 Stillwater level -- and that's what we've
20 been talking about, okay?  I can appreciate
21 that.  But did you have knowledge that that
22 was a common practice at other school
23 districts as well, the keep -- the
24 maintaining of a secret file or was it just
25 at Stillwater?

```
1    A    The only place I ever heard about it
2  was here.  I mean, I had taught for eight
3  years in Houston at Fort Bend ISD, but I
4  mean, it's a huge district.  So, I mean, I
5  don't know.
6    Q    You don't have knowledge of that
7  happening at other school districts in
8  Oklahoma?
9    A    No.
10   Q    Fair?
11   A    That's fair.
12   Q    It was unique to Stillwater?
13   A    Yes.
14   Q    As far as you know?
15   A    As far as I know.
16   Q    Okay.  When you worked at Houston,
17 did they have secret files that weren't
18 part of an employee's personnel file?
19   A    That I know of, no.
20   Q    Okay.  I want to talk with you --
21 you kind of gave me the general background,
22 and I really appreciate that on the
23 education association.  When it comes to
24 the specific incident with Principal
25 Fields, okay?
```
59

1     A    Yes.
2     Q    But what you observed was Principal
3 Fields just falling over a bench and not
4 actually assaulting someone?
5     A    And the kid falling over the -- the
6 kid falling back and then the -- well,
7 that's how.
8     Q    It looked like a fall as opposed --
9     A    Exactly.
10     Q    -- to an attack?
11     A    Exactly.
12     Q    But then you also understood that
13 after that incident that happened that you
14 witnessed, that there were historical
15 records that had been maintained in a
16 secret file, not part of Principal Fields'
17 personnel file, that were ultimately used
18 to put him in a bad light, to bring about
19 his resignation?
20           MR. PRIDDY:  Object to the form.
21     Q    (By Mr. Smolen)  Is that right?
22     A    Right.
23     Q    Okay, I gotcha.  I totally
24 understand that.
25     A    Because somebody may have not liked

his position or the way he did things.

Q Someone who might have known about the secret file, might have used the secret file to get Mr. Fields out of his position and get someone in there that they wanted, right?

   MR. PRIDDY: Object to the form.
   THE WITNESS: Yes.

Q (By Mr. Smolen) That was the idea?

A Yes.

Q Okay, gotcha. Did you know one way or the other whether or not there was a secret file on you?

A No, I didn't.

Q Okay. Do you know if these files that were secret and not part of the personnel file were maintained electronically or just in writing -- just in paper?

A I don't know.

   MR. PRIDDY: Object to the form.
   THE WITNESS: I don't know. Hold on. My phone --
   MR. SMOLEN: Do you need to take it?

```
 1  don't see anything wrong, but then we did
 2  not know that he was doing what he was
 3  doing.
 4       Q    Right.  But Fieldsend was at least
 5  picking up on the fact that this is going
 6  to give him problems.  He's got a harem of
 7  girls in there day after day?
 8       A    And it's not like -- everybody had
 9  to have known it.  I mean, everybody,
10  noticed so I would have thought somebody
11  would have told him, at least the
12  supervisor.
13       Q    Okay.  And that you raised a really
14  good point, because when you're looking at
15  this on a day-to-day basis and you guys are
16  in an educational setting and you're doing
17  it for a long time like you've done,
18  sometimes things just become so obvious
19  that certainly someone had to become aware
20  of it, right?
21       A    Uh-huh.
22       Q    Would you describe this situation
23  with Morejon and what Fieldsend described
24  as the harem of girls to be something that
25  was so obvious it would be impossible for
```

1  the administration not to be aware that it
2  was going on?
3          MR. PRIDDY: Object to the form.
4          THE WITNESS: Yes.
5     Q   (By Mr. Smolen) And so as far as a
6  reporting requirement might go, you felt
7  like, if I understand your testimony, there
8  was really nothing to report, because it
9  was so out in the open that it was so
10 openly obvious, there was no way the
11 administration didn't know about it.
12         MR. PRIDDY: Object to the form.
13         THE WITNESS: Right.
14    Q   (By Mr. Smolen) Okay. Other than
15 the conversation with Fieldsend at lunch
16 that you mentioned, do you recall any other
17 -- and I understand you maybe had more than
18 that conversation. But as far as
19 explicitly having a memory of details of a
20 conversation, do you have any more than
21 that one?
22    A   No, not really.
23    Q   Okay. Let's look at SPS. It is our
24 Exhibit 9. It is Bates labeled SPS 31.
25         MR. SMOLEN: And, John, I've got