**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

ISABELA SNEED,           )
          Plaintiff, )
                         )
vs.                      )Case No.  22-cv-00031-R
                         )
INDEPENDENT SCHOOL )
DISTRICT NO. 16 OF )
PAYNE COUNTY,      )
          Defendant. )

**DEPOSITION OF**
**MICHAEL SHANAHAN**

DATE:  JULY 17, 2023

REPORTER:  MARISA SPALDING, CSR, RPR

Spalding Reporting Service, Inc.
1611 South Utica Avenue, Box 153
Tulsa, Oklahoma 74104
spaldingreportingservice@cox.net
(918) 284-2017

**EXHIBIT**
**1**

**A P P E A R A N C E S:**

       FOR THE PLAINTIFF:
          **SMOLEN & ROYTMAN, P.L.L.C.**
          701 South Cincinnati Avenue
          Tulsa, Oklahoma 74119
               **BY: MR. DANIEL E. SMOLEN**

          **MOORE-SHRIER LAW FIRM (By Zoom)**
          624 South Boston Avenue,
          Suite 1070
          Tulsa, Oklahoma 74119
               **BY: MR. DREW MATHEWS**


       FOR THE DEFENDANT:
          **ROSENSTEIN, FIST & RINGOLD**
          525 South Main Street, Suite 700
          Tulsa, Oklahoma 74103
               **BY: MS. SAMANTHIA MARSHALL**


**ALSO PRESENT:** Ellis Newkirk



    DEPOSITION OF **MICHAEL SHANAHAN**, produced

as a witness duly sworn by me, taken in the

above-styled and numbered cause on the 17th

day of July, 2023, at 1:18 p.m., before

**MARISA SPALDING**, Certified Shorthand

Reporter No. 01750 in and for the State of

Oklahoma, at the offices of Rosenstein, Fist

& Ringold, 525 South Main Street, Suite 700,

in accordance with the agreement hereinafter

set forth.

# A G R E E M E N T S

It is hereby agreed by and between the parties hereto, through their respective attorneys appearing herein, that the Plaintiff may take the deposition of **MICHAEL SHANAHAN** at this time, that said deposition is being taken by Notice & Agreement and said deposition is being taken with the same force and effect as though all the requirements of the Rules and Statutes had been fully complied with.

It is further agreed by and between the parties hereto, through their attorneys appearing herein, that any and all objections to any question, except as to form contained herein, may be made upon the offering of this deposition in evidence upon the trial of this cause with the same force and effect as though the witness were present in person and testifying from the witness stand.

It is further agreed by and between the parties hereto, through their attorneys appearing herein, that this deposition may be signed before any Notary Public and

1  thereafter returned into Court and used upon

2  the trial of this cause with the same force

3  and effect as though all requirements of the

4  Rules and Statutes with reference to

5  signature and return had been fully complied

6  with.

7      It is further agreed by and between the

8  parties hereto, through their attorneys

9  appearing herein, that if the original of

10  this deposition has not been properly signed

11  before any officer authorized to administer

12  oaths within (30) days after its submission

13  to said witness and thereafter returned to

14  the attorney who asked the first question

15  appearing in the transcript prior to any

16  contested hearing in this cause, that an

17  unsigned, certified copy may be substituted

18  and used for all purposes, the same as

19  though the original had been signed by said

20  witness and properly returned.

21

22

23

24

25

**INDEX**

PAGE

Appearances 2

Agreements 3

**MICHAEL SHANAHAN**

    Examination by Mr. Smolen 6

Jurat 77

Correction Sheet 78

Reporter's Certificate 79

**EXHIBIT INDEX**

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| PX 6 | Resignation Letter | 14 |
| PX 4 | Police Report | 16 |
| PX 5 | Police Report | 16 |
| PX 23 | Resource Officers Document | 20 |
| PX 16 | Crystal Szymanski Letter | 33 |
| PX 15 | Emails | 45 |
| PX 17 | Holly Engel Letter | 48 |
| PX 11 | Title IX Regulations | 62 |

1    employment file, personnel file.

2        Q    Okay.  Let me ask you to take a look

3    at this because I want to find out just from

4    your own experience where a document like

5    this would -- would be stored.

6                (Plaintiff's Exhibit No. 16

7                 marked for identification)

8        Q    I'm assuming you have not seen this

9    prior to me showing it to you, but if I'm

10   wrong --

11       A    I have not seen this.

12       Q    Okay.  Take a minute to read that to

13   yourself and let me -- I'm going to ask you

14   some questions about it.

15       A    Okay.

16       Q    Okay.  I want to start off by just

17   noting that the top of the document -- this

18   isn't addressed to any particular person; do

19   you see that?

20       A    Yes.

21       Q    Okay.  And at the top, it says:  For

22   Internal SPS Purposes Only.  Have you ever

23   seen a document -- or is there a designation

24   -- was there a designation at the time that

25   you were working there in personnel and HR

1  where documentation was maintained for

2  internal SPS purposes only?

3     A   No, I'm not aware of it.

4     Q   Okay.  I'm trying to understand

5  where a document like this would have been

6  maintained, for example, once it had been

7  submitted by, in this case, the principal of

8  the junior high school?

9     A   Where did you find it?

10    Q   Well, it was produced late in

11 discovery just about a week ago by the

12 defendants.  That's why I'm wanting to know

13 where this type of document would be stored,

14 a document that was for SPS purposes only?

15    A   I'd have to guess.  I have no really

16 --

17    Q   And even if it's a guess, that's

18 fine, as long as you just let me know you're

19 guessing?

20            MS. MARSHALL:  Object to form.

21            THE WITNESS:  Yeah, so if I was

22 guessing -- is guessing okay?

23    Q   (By Mr. Smolen)  Yeah.

24    A   If I was guessing, I would say that

25 would be something the principal may -- you

1　know, I don't what they do with it to tell
2　you the truth.
3　　Q　Okay.　Would you have had an
4　expectation if at the time you were working
5　in human resources that this would have been
6　shared with you?
7　　A　Would I expect this principal to
8　share this data with me?
9　　Q　Yes, sir.
10　　A　As an -- it would be appropriate,
11　yes.
12　　Q　Okay.
13　　A　It may not be me exactly.　It may be
14　their -- you know, the principals upline, it
15　may be different.　It may be them.　But
16　eventually it would be -- looks like it
17　ought to be an HR question.
18　　Q　An HR -- a document that would
19　ultimately find its way to your hands as the
20　head of HR?
21　　A　Right.
22　　Q　And I understand you had already
23　retired and you weren't there at the time
24　that this was drafted, okay?　Do you know
25　who Crystal Szymanski is?

1    A    Now that I see her signature, yes.

2    Q    Okay.  And who did you understand --

3    or how did you know Crystal?

4    A    Well, she became principal, I think,

5    of the junior high school.  And I don't -- I

6    don't remember if it was the -- started in

7    '20 or if she had been there a year.  I

8    think she started in '20.

9    Q    Okay.

10    A    Fiscal year '21.

11    Q    Okay.  She indicates in this letter:

12    In my first year with Stillwater Public

13    Schools and at Stillwater Junior High

14    School, I took that as being the fall

15    semester of '20, the spring semester of '21.

16    Again, that's just how I'm taking it because

17    of the way it's been drafted.

18    A    I believe that's -- that's what I

19    think I remember.

20    Q    Okay.  She says:  I have become

21    aware of several patterns of information

22    with regard to Mr. Morejon's interaction

23    with students in prior school years when he

24    was an employee of the district.  She says:

25    I have overheard conversations and been told

1    some specific things that lead me to believe

2    the following information was somewhat

3    common knowledge by much of the SJSH staff.

4    Are you following with me?

5        A    Uh-huh.

6        Q    One -- and she lists four bullet

7    points here.  First point bullet was that

8    Mr. Morejon generally had lots of students

9    in his room during the lunch break.

10   Conversation suggest these students were

11   generally female or members of the baseball

12   team coached by Mr. Morejon.

13       The second bullet point indicates:

14   Students often requested to take Mr. Morejon

15   chocolate milk during his lunch and other

16   lunch periods interrupting his 4th hour

17   class.  Students would tell supervisory

18   staff that Mr. Morejon loved chocolate milk

19   and that they needed to take him some.

20       Mr. Morejon's room was a popular student

21   hangout before school in the morning and

22   during tutorials.  Conversations suggest

23   that student would run to his room in order

24   to get a seat there for the tutorial period.

25       And then lastly, the fourth bullet point

was: Staff believed some of Mr. Morejon's
student interactions were odd but not odd
enough to be crossing any lines.
Conversation suggest that some staff members
did attempt to tell Mr. Morejon that his
interactions were odd and could be
misinterpreted.

The way this letter is written on its
face, Szymanski is implying that it was
somewhat common knowledge by much of the
staff at Stillwater Junior High School, that
these -- this information contained in these
four bullet points was common knowledge
amongst the entire staff. Did you have any
knowledge of any of this information prior
to your retirement?

MS. MARSHALL: Object to form.

THE WITNESS: No.

Q (By Mr. Smolen) Okay. Had this
information before shared with you, okay,
and I understand you're saying it had not
been, but had it been shared with you during
the time that you were employed there as the
human resources director, what would the
steps have been that you would have taken,

1    if any, to investigate the allegations that

2    are made in the -- in the exhibit?

3        A    Well, I would have followed the

4    requisite policy.

5        Q    And I'm not asking you to just

6    verbatim tell me what the policy said word

7    for word.  I'm just asking you as a person

8    who assumed that role for six years, you get

9    this letter.  Walk me through the steps you

10   would have taken had it come in front of

11   you.

12              MS. MARSHALL:  Object to form.

13              THE WITNESS:  You know, I didn't

14   have this information presented to me.

15       Q    (By Mr. Smolen)  I know.  And,

16   again, I want --

17       A    I've been doing this for a long

18   time.  I would follow the policy.  I would

19   contact the -- my upline and make sure I was

20   -- that everybody was informed.  I would

21   take care of the students.

22       Q    Would you have felt it necessary to

23   investigate who the supervisory staff that

24   was allowing the students to leave the lunch

25   room, for example, were?

1    A    Well, again, the -- possibly, but
2  this -- this was a -- this was a principal
3  -- you know, this is not a claim of -- of
4  misbehavior, and the principal -- or
5  somebody in that administrative team should
6  -- you'd expect them to address the issue
7  and -- you know, determine if there was a
8  problem or not and go from there.
9    Q    I mean, to me, when I'm looking at
10 Bullet Point No. 4, okay, and it says:
11 Staff believed some of Mr. Morejon's student
12 interactions were odd but not odd enough to
13 be crossing any lines, what does that mean
14 to you in someone who's worked in a position
15 like you've worked in for the number of
16 years that you've worked in, I mean, when
17 someone -- when a principal is describing
18 behavior as odd -- interactions as odd, but
19 not odd enough to cross a line?
20         MS. MARSHALL:  Object to form.
21         THE WITNESS:  You know, you're
22 asking me to exercise the -- my authority as
23 a human resource administrator, which I quit
24 doing, you know, a year before this letter,
25 basically, and I haven't been considering

1     what to do in these situations.

2         So I'm -- I don't know that my -- you

3     know, it's always easy to look back and say,

4     if I was there, I would have done something,

5     something, but that is probably not a very

6     accurate response.  I'm going to have to

7     tell you that I would have followed my --

8     the policies and the appropriate directives

9     that the - -you know, the -- the

10    administrator staff gets paid to exercise,

11    execute.

12        Q    (By Mr. Smolen)  Okay.  So where it

13    says:  Staff believed some of Mr. Morejon's

14    student interactions were odd but not odd

15    enough to be crossing the line, would you

16    have initially -- let me ask you this.

17    Would you have expected staff who had

18    observed that consistently over the years to

19    have reported that to human resources?

20        A    Not necessarily.  But if I was the

21    principal, I'd want to be a little more

22    explicit on what that means.

23        Q    I mean, that's what I am getting at.

24        A    Yes.

25        Q    I mean, as the human resources --

1      A    Well, not necessarily HR, but

2  certainly the principal ought to know what

3  that sentence contains, what that means.

4      Q    Right.  I mean, I'm reading this and

5  I want to know, well, what do you mean by

6  odd interactions specifically, right?

7      A    (Moving head up and down)

8      Q    You'd want to know that it would

9  seem like?

10     A    Yeah.

11     Q    Okay.

12     A    I'd want to know if I need to be.

13     Q    Well, I'd also want to know, well,

14  whose line are you talking about and what do

15  you mean it's not quite enough to cross that

16  line and who made that line?  What line are

17  you talking about, right?

18     A    Correct.

19     Q    Okay.  Conversation suggest that

20  some staff members did attempt to tell Mr.

21  Morejon that his interactions were odd and

22  could be misinterpreted.  I'd want to know

23  what you meant by misinterpreted because

24  it's possible that someone's interpreting

25  them appropriately versus being

1    misrepresented, agreed?

2            MS. MARSHALL:  Object to form.

3            THE WITNESS:  The -- the bullet

4    point requires -- could require further

5    explanation.

6        Q    (By Mr. Smolen)  The idea that

7    someone is making a statement that odd

8    interactions could be misinterpreted, the

9    inverse of that is that someone is

10   interpreting those to be properly odd,

11   right, and what is it indicating when they

12   say misinterpreted?  Misinterpreted as to

13   what, agreed?  To leave some question there

14   about what's going on?

15       A    It needs --

16           MS. MARSHALL:  Object to form.

17           THE WITNESS:  Yeah, it needs

18   some clarity.

19       Q    (By Mr. Smolen)  Short of being

20   noticed for a deposition in this case, did

21   you have any knowledge about any of the

22   allegations pertaining to Morejon prior to

23   your departure from the Stillwater Public

24   Schools?

25       A    What I remember is that during that

```
 1              * *  J U R A T  * *

 2

 3         I, **MICHAEL SHANAHAN**, do hereby state

 4    under oath that I have read the above and

 5    foregoing deposition in its entirety and

 6    that with my corrections, if any there be,

 7    the same is a full, true and correct

 8    transcript of my testimony.

 9    ___✓_ With Corrections

10    _____ No Corrections

11    *Michael Shanahan*

12    **MICHAEL SHANAHAN**

13    STATE OF _OKLAHOMA_

14    COUNTY OF _CREEK_

15

16         SUBSCRIBED AND SWORN TO before me,

17    the undersigned Notary Public in and for the

18    State of _Oklahoma_ by said witness,

19    **MICHAEL SHANAHAN**, this the _18th_ day of

20    _August_ 2023.

21                    *Jodie M. Walters*

22    NOTARY PUBLIC
      STATE OF _Oklahoma_

23

24

25    MY COMMISSION EXPIRES: _April 30, 2027_
```



Notary Public
State of Oklahoma
JODIE M. WALTERS
ROGERS COUNTY
COMMISSION #03006176
Comm. Exp. 94-30-2027

```
1    * *   C O R R E C T I O N   S H E E T   * *

2

3    NAME:  MICHAEL SHANAHAN

4    DATE OF DEPOSITION:  JULY 17, 2023

5    JURAT & CORRECTION DUE:30 DAYS FROM RECEIPT

6    RETURN TO:  SPALDING REPORTING SERVICE, 1611
     S. UTICA AVENUE, BOX 153, TULSA, OKLAHOMA
7    74104

8    PAGE LINE    CORRECTION & REASON FOR CHANGE

9    P. 44   L. 10     "He" to "I"         Misspoke / Misheard

10   P. 72   L. 4      "assessable" to "accessible"    Typo

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25
```

April 29, 2021

For Internal SPS Purposes Only:

In my first year with Stillwater Public Schools and at Stillwater Junior High School, I have become aware of several patterns of information with regards to Mr. Morejon's interaction with students in prior school years when he was an employee of the district.

I have overheard conversations and been told some specific things that lead me to believe the following information was somewhat common knowledge by much of the staff at SJHS.

- Mr. Morejon generally had lots of students in his room during his lunch break. Conversation suggests these students were generally female or members of the baseball team coached by Mr. Morejon.
- Students often requested to take Mr. Morejon chocolate milk during his lunch and also other lunch periods (interrupting his 4th hour class). Students would tell supervisory staff that Mr. Morejon loved chocolate milk and that they needed to take him some.
- Mr. Morejon's room was a popular student hangout before school in the morning and during tutorials. Conversation suggests that students would run to his room in order to get a seat there for the tutorial period.
- Staff believed some of Mr. Morejon's student interactions were odd but not odd enough to be crossing any lines. Conversation suggests that some staff members did attempt to tell Mr. Morejon that his interactions were odd and could be misinterpreted.

Additional information:
- Mr. Morejon was voted student favorite teacher in the 19-20 school yearbook. These were delivered and given to students in August 2020 (late due to COVID).



Crystal Szymanski, Principal


PLAINTIFF'S EXHIBIT
16
PENGAD 800-631-6989

SPS 002167